Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Jennifer Abreu, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and                          Docket No.:_____ (      )
GEICO CASUALTY COMPANY,

                                        Plaintiffs,

                                                                    **Plaintiff Demands a Trial by Jury**
              -against-

TOWN SUPPLY, INC., OLGA IZRAYEV, and JOHN
DOE DEFENDANTS 1-10,

                                        Defendants.
-----------------------------------------------------------------X

## COMPLAINT

Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## INTRODUCTION

1.      This action seeks to recover more than $460,000.000 that the Defendants

wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of

fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise

1

unreimbursable durable medical equipment ("DME") and orthotic devices ("OD") (e.g., continuous passive motion ("CPM") machines, cold therapy units ("CTUs"), deep vein thrombosis devices ("DVT Devices"), knee or shoulder orthosis etc.) (collectively, the "Fraudulent Equipment") through Town Supply, Inc. ("Town Supply").

2.　　Town Supply is a retailer that provides and rents certain DME and OD products and is owned by Olga Izrayev ("Izrayev"). In short, Izrayev devised a scheme in conjunction with others who are not readily identifiable to GEICO to obtain prescriptions from various healthcare providers (the "Referring Providers") in order to submit large volumes of billing to GEICO and other New York automobile insurance companies for purportedly providing and renting Fraudulent Equipment through Town Supply that was medically unnecessary, illusory, and otherwise not reimbursable.

3.　　Based upon prescriptions for Fraudulent Equipment issued by the Referring Providers, Town Supply and Izrayev (collectively, the "Defendants") allegedly provided and rented Fraudulent Equipment to individuals who claimed to have been involved in automobile accidents in New York and were eligible for insurance coverage under GEICO insurance policies (the "Insureds").

4.　　GEICO seeks to recover more than $460,000.00 that has been wrongfully obtained by the Defendants and further seeks a declaration that it is not legally obligated to pay reimbursement of more than $1,600,000.00 in pending No-Fault insurance claims that have been submitted by or on behalf of the Defendants because:

　　　　　(i)　　The Defendants billed GEICO for Fraudulent Equipment purportedly provided or rented to Insureds as a result of unlawful financial arrangements with others who are not presently identifiable;

2

(ii)     The Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and provided – to the extent that any equipment was provided – pursuant to prescriptions issued by the Referring Providers as a result of predetermined fraudulent protocols, which were designed solely to financially enrich the Defendants and others not presently known, rather than to treat the Insureds; and

(iii)    To the extent that any equipment was rented to Insureds, the bills for Fraudulent Equipment submitted to GEICO by Defendants fraudulently misrepresented that the charges were permissible and grossly inflated the permissible reimbursement rate that the Defendants could have received for the Fraudulent Equipment.

5.     The Defendants fall into the following categories:

(i)     Defendant Town Supply is a New York corporation that purports to purchase DME and OD from wholesalers, purports to provide Fraudulent Equipment to automobile accident victims, and bills GEICO and other New York automobile insurance companies for providing Fraudulent Equipment.

(ii)     Defendant Izrayev owns, operates, and controls Town Supply and uses Town Supply to submit bills to GEICO and other New York automobile insurance companies for providing Fraudulent Equipment to automobile accident victims.

(iii)    John Doe Defendants 1-10 are citizens of New York and are not presently identifiable but are associated with the Referring Providers and various medical offices or surgical centers where the Referring Providers operate from that purportedly treat high-volume of No-Fault insurance patients (the "No-Fault Clinics"), and who have conspired with the Defendants to further the fraudulent scheme committed against GEICO and other New York automobile insurers.

6.     As discussed below, the Defendants always have known that the claims for Fraudulent Equipment submitted to GEICO were fraudulent because:

(i)     The Fraudulent Equipment was provided – to the extent that any equipment was provided – based upon prescriptions received as a result of unlawful financial arrangements between the Defendants and others who are not presently identifiable and thus, not eligible for no-fault insurance reimbursement in the first instance;

(ii)     The prescriptions for Fraudulent Equipment were not medically necessary and the Fraudulent Equipment provided – to the extent that any equipment

was provided – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants and others not presently known rather than to treat or otherwise benefit the Insureds; and

(iii) To the extent that any equipment was rented to Insureds, the bills for Fraudulent Equipment submitted by the Defendants to GEICO – and other New York automobile insurers – fraudulently misrepresented that the charges were permissible and grossly inflated the permissible reimbursement rate that the Defendants could have received for the Fraudulent Equipment.

7. As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through Town Supply.

8. The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, to GEICO pursuant to the Defendants' fraudulent scheme.

9. The Defendants' fraudulent scheme involving Town Supply against GEICO and the New York automobile insurance industry began no later than January 1, 2019, and the scheme has continued uninterrupted since that time.

10. As a result of the Defendants' fraudulent schemes, GEICO has incurred damages of more than $460,000.00.

## THE PARTIES

### I. Plaintiffs

11. Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

4

## II.     Defendants

12.     Defendant Town Supply is a New York corporation with its principal place of business in Queens, New York. Town Supply was incorporated on September 24, 2013, is owned, operated and controlled by Izrayev, and has been used by Izrayev, with the assistance of others not presently identifiable by GEICO as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

13.     Defendant Izrayev resides in and is a citizen of New Jersey. Izrayev is not and has never been a licensed healthcare provider. Izrayev owns, operates, and controls Town Supply and entered into unlawful financial arrangements with others who are not presently identifiable in order for Town Supply to obtain prescriptions for the Fraudulent Equipment purportedly issued by the Referring Providers.

## III.    Other Pertinent Individuals

14.     Although not named as Defendants in this Complaint, Right Choice Supply, Inc. ("Right Choice"), Irene Yagdayev ("Yagdayev"), Ranbow Supply of N.Y., Inc. a/k/a Rainbow Supply of N.Y., Inc. ("Rainbow Supply), and Medzanun Gulkarov ("Gulkarov") are entities and individuals relevant to understanding the claims in this action.

15.     Right Choice is a New York corporation, incorporated on or about July 24, 2015, and is owned, operated, and controlled by Yagdayev.

16.     Rainbow Supply is a New York corporation, incorporated on or a about April 14, 2015, and is owned, operated, and controlled by Gulkarov – Yagdayev's spouse.  In addition to owning and operating Town Supply, Izrayev also serves as Rainbow Supply's officer manager.

17.     In or about 2017, Right Choice and Rainbow Supply were the subjects of GEICO investigations pertaining to no-fault claims submitted by Right Choice and Rainbow Supply to

GEICO seeking reimbursement for DME and OD (e.g., CTUs and CPM) that were purportedly dispensed to Insureds.

18.     Notably, thereafter, Right Choice's billing for certain DME items began to dramatically decrease, while its billing for other DME items drastically increased.

19.     Specifically, between 2018 and 2021, Right Choice's billing for CTUs, CPMs, DVTs, and sheepskin pads decreased by more than 55%, while its billing for shoulder and knee braces, shoulder immobilizers, and canes increased by more than 2000%.  At the same time, Town Supply's billing for CTUs, CPMs, DVTs and sheepskin pads increased exponentially, with a majority of the Insureds who were receiving various forms of DME and OD from Right Choice (i.e., the non-rental items) were also receiving a specific set of rental DME items from Town Supply.

20.     Although Right Choice and Town Supply purport to operate as distinct and separate entities owned by different owners, based upon belief and information, Town Supply and Right Choice operate from the same location, 104-27 Jamaica Avenue, Jamaica, New York.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

22.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

23.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

24.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred, and where one or more of the Defendants reside.

## ALLEGATIONS COMMON TO ALL CLAIMS

25.     GEICO underwrites automobile insurance in the State of New York.

## I.     An Overview of the Pertinent Laws

### A.     Pertinent Laws Governing No-Fault Insurance Reimbursement

26.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

27.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

28.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD. See N.Y. Ins. Law § 5102(a).

29.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

30.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

7

31.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

32.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare service providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law

33.     New York law prohibits licensed healthcare service providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME or OD. See, e.g., N.Y. Educ. Law §§ 6509-a; 6530(18); 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

34.     Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party". See N.Y. Educ. Law §§ 6509(10), 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

35.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

36.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

37.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

38.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.     Pertinent Regulations Governing No-Fault Benefits for DME**

39.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME or OD that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME or OD that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

40.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can

include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, whirlpool baths, cryotherapy, continuous passive motion devices, and devices to prevent deep vein thrombosis.

41.     OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of joints, spine, or limbs.  These devices come in direct contact with the outside of the body, and include items as cervical collars, lumbar supports, knee supports, ankle supports, wrist braces, and the like.

42.     To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME or OD charges, the maximum charges that may be submitted by healthcare providers for DME and OD are set forth in the New York Fee Schedule.

43.     In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME and OD charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

44.     As it relates to DME and OD, the New York Fee Schedule sets forth the maximum charges as follows:

> (a)     The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State

10

Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:

(1) the acquisition cost (i.e., the line item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or

(2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2.

45.     As indicated by the New York Fee Schedule, payment for DME or OD is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

46.     According to the New York Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME or OD is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

47.     For Fee-Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning Healthcare Common Procedure Coding System ("HCPCS") Codes that should be used by DME and OD companies to seek reimbursement for – among other things – Fee Schedule items.  The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under a specific HCPCS Code.

48.     The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Palmetto.  Medicaid has specifically defined the HCPCS Codes contained within the Medicaid Fee Schedule in its Durable Medical Equipment, Orthotics, Prosthetics and Supplies Procedure Codes and Coverage Guidelines ("Medicaid DME Procedure Codes") which mimic the definitions set forth by Palmetto.

49.     Where a specific DME or OD does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as GEICO to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

50.     For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

51.     To the extent that bills for No-Fault Benefits are for Non-Fee Schedule items and the HCPCS Codes are not within the Medicaid DME Procedure Codes, the definitions set forth by Palmetto control to determine whether an item of DME or OD qualify for reimbursement under a specific HCPCS Code.

52.     As it relates to charges for renting DME or OD, the New York Fee Schedule sets forth the maximum charges as follows:

> the maximum permissible monthly rental charge for such equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule.

See 12 N.Y.C.R.R. § 442.2(b).

53.     As indicated by the New York Fee Schedule, the total monthly rental cost for Fee-Schedule items shall not exceed the <u>lower</u> of: (i) the monthly rental charge to the general public; or (ii) the monthly fee permitted under the Medicaid Fee Schedule.

54.     Under the Medicaid Fee Schedule, the total monthly rental charges for equipment, supplies, and services of Fee Schedule items is 10% of the maximum reimbursement amount.

55.     However, when DME is rented and charged to automobile insurers using HCPCS codes that are recognized by the Medicaid Fee Schedule but do not contain a maximum reimbursement amount, the maximum charge for a monthly rental is 10% of the acquisition cost for the DME or OD. <u>See</u> <u>New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines</u>, p. 16; <u>Gov't Emples. Ins. Co. v. MII Supply LLC</u>, Index No. 616953/18, Docket No. 43 (N.Y. Sup. Ct. Nassau Cty. December 4, 2019) (applying the 10% of acquisition cost rule for DME rentals within the New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines to No-Fault reimbursement for HCPCS Codes that are recognized by the Medicaid Fee Schedule but do not contain a reimbursement amount).

56.     For charges related to rental cost of Non-Fee Schedule items, the maximum monthly rental cost, as per the New York Fee Schedule, is the monthly cost to the general public because the New York State Department of Health has not established a price for DME rentals and defers as a matter of policy to the New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines.

57.     Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)     The provider received a legitimate prescription for reasonable and medically necessary DME and/or OD from a healthcare practitioner that is licensed to issue such prescriptions;

(ii)    The prescription for DME or OD is not based on any unlawful financial arrangement;

(iii)   The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s); and

(iv)    The fee sought for DME or OD provided to an Insured was not in excess of the price contained in the Medicaid Fee Schedule or the standard use for a Non-Fee schedule item; or

(v)     The *pro rata* monthly rental fee sought for renting DME or OD to an Insured was not in excess of: (a) 10% of the maximum reimbursement rate for Fee Schedule items; (b) 10% of the acquisition cost for Fee Schedule items without a listed maximum reimbursement rate; or (c) the price to the public for Non-Fee Schedule items.

## II.    The Defendants' Fraudulent Schemes

### A.   Overview of the Defendants' Fraudulent Schemes

58.     Beginning in or about January 2019, Izrayev masterminded and implemented a complex fraudulent scheme in which she would use Town Supply as a vehicle to bill GEICO and other New York automobile insurers more than $3.6 million in No-Fault Benefits which the Defendants were never entitled to receive.

59.     Izrayev used Town Supply to directly obtain No-Fault Benefits and maximize the amount of No-Fault Benefits she could obtain by submitting fraudulent bills to GEICO and other automobile insurers seeking reimbursement for Fraudulent Equipment.

60.     Between January 2019 and the present, the Defendants submitted more than $3,600,000.00 million in fraudulent claims to GEICO seeking reimbursement for Fraudulent Equipment.  To date, the Defendants have wrongfully obtained more than $460,000.00 from

GEICO, and there is more than $1,600,000.00 in additional fraudulent claims that have yet to be adjudicated but which the Defendants continue to seek payment from GEICO.

61.     The Defendants were able to perpetrate the fraudulent scheme against GEICO described below by obtaining prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers because of improper agreements with third-party individuals who are not presently identifiable.

62.      As part of this scheme, the Defendants obtained prescriptions for Fraudulent Equipment that were purportedly issued by the Referring Providers, most of whom routinely performed surgeries that generally consisted of minimally invasive arthroscopic procedures on the Insureds.

63.     Defendants received the prescriptions for Fraudulent Equipment, purportedly issued by the Referring Providers as part of the unlawful financial arrangements with third-parties who are not presently identifiable, directly through the Referring Providers or No-Fault Clinics.

64.     Once the Defendants received the prescriptions from the Referral Providers, the Defendants would submit either NF-3 or HCFA-1500 forms to GEICO seeking reimbursement for Fraudulent Equipment that was purportedly provided to the Insureds.

65.     By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment, the Defendants represented that they provided Insureds with Fraudulent Equipment that was medically necessary as determined by a healthcare provider licensed to prescribe DME and/or OD.

66.     However, none of the charges identified in Exhibit "1" were for medically necessary medical equipment. To the contrary, the Fraudulent Equipment purportedly dispensed

by the Defendants, and identified in Exhibit "1" was provided and rented to Insureds pursuant to predetermined protocols and illegal financial arrangements.

67.    In keeping with the fact that the Fraudulent Equipment was prescribed pursuant to predetermined fraudulent protocols, the length of the rentals to Insureds for the Fraudulent Equipment virtually always exceeded medical utility and did not comport with generally accepted medical guidelines.

68.    For example, the charges related to the rental of CTUs and CPMs for weeks at a time were routinely based upon prescriptions received after minimally invasive arthroscopic procedures when the post-operative care included physical therapy obviating the need for CTUs and CPMs.

69.    In addition, many charges identified in Exhibit "1" were based upon prescriptions purportedly issued by Referring Providers and submitted to GEICO by the Defendants that contained photocopied signatures or initials on pre-printed forms.

70.    In furtherance of their scheme to defraud GEICO and other automobile insurers, the Defendants submitted bills for rental items that grossly inflated the permissible reimbursement rate for the Fraudulent Equipment in order to maximize the amount of No-Fault Benefits that they could receive.

71.    To further their scheme to defraud GEICO, and other automobile insurers, the Defendants submitted bills for rental items that falsely indicated they were seeking reimbursement at: (i) a monthly rental rate of 10% of the acquisition cost or maximum reimbursement amount of Fee Schedule items; or (ii) less than or equal to the monthly rental cost to the general public for the same Non-Fee Schedule item.

16

72.     In actuality, the bills submitted by the Defendants to GEICO for renting Fraudulent Equipment contained grossly inflated reimbursement rates that did not accurately represent: (i) the maximum permissible cost for renting Fee Schedule items; and (ii) the maximum permissible cost for renting Non-Fee Schedule items.

73.     After obtaining medically unnecessary prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers, the Defendants would bill GEICO for: (i) Fraudulent Equipment that was not reasonable or medically necessary; (ii) Fraudulent Equipment that was dispensed pursuant to predetermined protocols and illegal financial arrangements; (iii) Fraudulent Equipment at grossly inflated reimbursement rates; and (iv) Fraudulent Equipment that was otherwise not reimbursable.

**B. The Defendants' Illegal Financial Arrangements**

74.     In order to obtain access to Insureds so the Defendants could implement and execute their fraudulent scheme and maximize the amount of No-Fault Benefits the Defendants could obtain from GEICO and other New York automobile insurers, the Defendants entered into illegal agreements with others who are not presently identifiable where prescriptions for Fraudulent Equipment were provided to the Defendants in exchange for financial consideration.

75.     Beginning in 2019, the Defendants engaged in unlawful financial arrangements with others who are not presently identifiable to obtain prescriptions for Fraudulent Equipment purportedly issued by the Prescribing Providers. These schemes allowed the Defendants to submit thousands of claims for Fraudulent Equipment to GEICO and other New York automobile insurers in New York.

76.     Upon information and belief, pursuant to unlawful financial arrangements, the Defendants would pay kickbacks to others who are not presently identifiable to obtain prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers.

77.     In keeping with the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements between the Defendants and others who are not presently identifiable, the prescriptions for Fraudulent Equipment were not medically necessary, were provided pursuant to predetermined protocols, and would not be provided by legitimate healthcare providers under identical circumstances.

78.     In further keeping with the fact that the prescriptions for the Fraudulent Equipment were the result of unlawful financial arrangements between the Defendants and others who are not presently identifiable, upon information and belief, the Defendants never met the Referring Providers who purportedly issued prescriptions that were used by the Defendants to bill GEICO. Instead, the prescriptions for Fraudulent Equipment were procured by the Defendants as a result of arrangements with others who are not presently identifiable.

79.     As explained in more detail below, the Defendants received prescriptions purportedly issued by the Referring Providers, and the prescriptions were not medically necessary as they contained predetermined sets of virtually identical Fraudulent Equipment.

80.     In keeping with the fact that the Defendants obtained prescriptions for Fraudulent Equipment as a result of unlawful financial arrangements, the Defendants: (i) obtained virtually identical pre-printed prescription forms that were used by multiple Referring Providers that purport to treat Insureds at different No-Fault Clinics; (ii) obtained prescriptions that contained a photocopied or stamped signature by the Referring Provider; and (iii) received virtually identical predetermined sets of prescriptions from multiple Referring Providers.

18

81.     In all of the claims identified in Exhibit "1," the Defendants falsely represented that Fraudulent Equipment was provided pursuant to lawful prescriptions from healthcare providers and were therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were provided pursuant to unlawful financial arrangements.

### C.     The Fraudulent Prescription-Issuing Protocol for Fraudulent Equipment

82.     In addition to the unlawful financial arrangements by the Defendants, the Defendants conspired with others who are not presently identifiable to obtain medically unnecessary prescriptions for Fraudulent Equipment, which were designed to maximize the billing that the Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

83.     The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibit "1" were issued pursuant to predetermined fraudulent protocols that were established by the Defendants and others who are not presently identifiable, not because the Fraudulent Equipment was medically necessary for each Insured based upon their individual symptoms or presentations.

84.     In all of the claims in Exhibit "1", virtually all of the Insureds were involved in relatively minor and low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

85.     Concomitantly, almost none of the Insureds identified in Exhibit "1", whom the Referring Providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

86.     In keeping with the fact that the Insureds identified in Exhibit "1" suffered only minor injuries – to the extent that they had any injuries at all – as a result of the relatively minor accidents, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

87.     To the extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and then sent on their way with a diagnosis no more serious than a minor soft tissue injury such as a sprain or strain.

88.     However, despite the fact that virtually all of the Insureds identified in Exhibit "1" were involved in relatively minor and low-impact accidents and only suffered from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds who treated with each of the Referring Providers were subject to similar treatment including undergoing arthroscopic surgeries and obtaining prescriptions for Fraudulent Equipment.

89.     The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibit "1" were issued pursuant to predetermined fraudulent protocols that were established by the Defendants and others who are not presently identifiable, not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

90.     No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit the fraudulent protocols described below to proceed under his, her, or its auspices.

91.     In general, the Defendants obtained prescriptions for medically unnecessary Fraudulent Equipment issued by the Prescribing Providers under the following pattern:

20

(i)     the Insured would arrive at a Clinic for treatment subsequent to a motor vehicle accident;

(ii)    the Insured would be seen by a physician, chiropractor, acupuncturist, physician's assistant, or nurse practitioner, and subsequently undergo multiple therapies, including chiropractic and physical therapy;

(iii)   thereafter, the Insured would be referred to an orthopedic surgeon for complaints regarding one or more of the Insureds' extremities, such as a shoulder or knee;

(iv)    the orthopedic surgeon would then perform a relatively minor arthroscopic surgical procedure on one or more of the Insured's extremities; and

(v)     as a result of the surgery, the orthopedic surgeon would provide one or more prescriptions for a CTU and a CPM, which would be provided to the Defendants to fill.

92.     In reality, the prescriptions for Fraudulent Equipment provided to the Insureds by the Defendants were not based on medical necessity but were part of predetermined fraudulent protocols and without regard for the Insureds' individual ability for post-surgical recovery.

93.     In a legitimate setting, when a patient injured in a motor vehicle accident undergoes a minimally invasive surgery, the surgeon would evaluate the patient's individual circumstances to determine a specific course of post-surgical rehabilitation.

94.     Furthermore, in a legitimate setting, in determining a specific course of post-surgical rehabilitation, a surgeon may – but does not always – prescribe DME that should aid in the patient's surgical recovery.

95.     In determining whether to prescribe DME to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME is likely to help improve the patient's complained of condition; and (iii)

21

whether the patient is likely to use the DME. In all circumstances, any prescribed DME would always directly relate to each patient's individual symptoms or presentation.

96.     Even more, in determining whether to prescribe DME as part of a patient's surgical recovery – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the patient is capable of performing at-home rehabilitative treatment; (ii) whether the patient is capable of undergoing physical therapy; (iii) whether the DME is likely to help improve the patient's surgical recovery; and (iv) whether the patient is likely to use the DME. In all circumstances, any prescribed DME would always directly relate to each patient's individual presentation for post-surgical recovery.

97.     It is extremely improbable – to the point of impossibility – that the vast majority of Insureds identified in Exhibit "1" who underwent minimally invasive surgical procedures would ultimately receive the same post-surgical treatment including prescriptions for the same Fraudulent Equipment despite being differently situated.

98.     A substantial number of Insureds receiving virtually identical prescriptions for post-surgical Fraudulent Equipment would, by extension, mean that all those Insureds had identical presentations for post-surgical recovery.

99.     However, pursuant to the predetermined fraudulent protocols implemented by the Defendants and others, the Insureds who underwent a surgical procedure were prescribed virtually identical post-surgical Fraudulent Equipment without regard for the medical necessity of the Fraudulent Equipment, the Insureds' individual post-surgical presentation, or ability for post-surgical recovery.

100.     In keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were part of a predetermined fraudulent protocol and not based on medical necessity,

22

virtually every Insured identified in Exhibit "1" – after undergoing a surgical procedure – was rented a CTU and CPM, regardless of each Insured's post-surgical presentation.

101.    For example:

- On May 27, 2020, an Insured named AP ████████ was purportedly involved in a motor vehicle accident. On August 21, 2020, Howard Baum, M.D. ("Dr. Baum") purportedly performed an arthroscopic procedure on AP's left shoulder at a surgical center located in Brooklyn, New York. Dr. Baum purportedly issued <u>undated</u> pre-printed prescription forms for Fraudulent Equipment, namely, a CTU for 21 days and a CPM for 6 to 8 weeks. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to AP.

- On November 9, 2019, an Insured named KC ████████ was purportedly involved in a motor vehicle accident. On December 20, 2019, Paul Ackerman, M.D. ("Dr. Ackerman") purportedly performed an arthroscopic procedure on KC's right shoulder at a surgical center located in Queens, New York. Dr. Ackerman purportedly issued <u>undated</u> pre-printed prescription forms for Fraudulent Equipment, namely, a CTU for 21 days and a CPM for 4 to 6 weeks. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to KC.

- On August 16, 2020, an Insured KB ████████ was purportedly involved in a motor vehicle accident. On January 8, 2021, Andrew Miller, M.D. ("Dr. Miller") purportedly performed an arthroscopic procedure on KB's left shoulder at a surgical center in Brooklyn, New York.  Dr. Miller purportedly issued <u>undated</u> pre-printed prescription forms for Fraudulent Equipment, namely, a CTU for 21 days and a CPM for 4 to 6 weeks.  The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to KB.

- On August 15, 2020, an Insured JM ████████ was purportedly involved in a motor vehicle accident. On November 25, 2020, Dov J. Berkowitz, M.D. ("Dr. Berkowitz") purportedly performed an arthroscopic procedure on JM's left shoulder at a surgical center in Jersey City, New Jersey. Dr. Berkowitz purportedly issued an <u>undated</u> pre-printed prescription form for Fraudulent Equipment, namely, a CTU for 14 days. Dr. Berkowitz also purportedly issued a <u>second</u> pre-printed prescription form – relating to the same arthroscopic procedure – for a CTU for 4 weeks and a CPM for 6 weeks. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to JM despite the fact that multiple prescriptions were issued for a CTU with different rental periods.

23

- On September 6, 2019, an Insured DA ███████████ was purportedly involved in a motor vehicle accident. On August 21, 2020, Dr. Miller purportedly performed an arthroscopic procedure on DA's right shoulder at a surgical center in Brooklyn, New York. Dr. Miller purportedly issued pre-printed prescription forms for Fraudulent Equipment, namely, a CTU for 21 days and a CPM for 4 to 6 weeks. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to DA.

- On January 15, 2020, an Insured SG ███████████ was purportedly involved in a motor vehicle accident. On August 30, 2020, Danilo H. Sotelo-Garza, M.D. ("Dr. Sotelo-Garza") purportedly performed an arthroscopic procedure on SG's right shoulder at a surgical center in New York, New York. Dr. Sotelo-Garza purportedly issued <u>undated</u> pre-printed prescription forms for Fraudulent Equipment, namely, a CTU for 22 days and a CPM for 4 to 6 weeks. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to SG.

- On March 7, 20219, an Insured AM ███████████ was purportedly involved in a motor vehicle accident. On August 21, 2020, Ajoy K. Sinha, M.D. ("Dr. Ajoy K. Sinha") purportedly performed an arthroscopic procedure on AM's right shoulder at a surgical center in Brooklyn, New York. Upendra K. Sinha, M.D. ("Dr. Upendra K. Sinha") purportedly issued <u>undated</u> pre-printed prescription forms for Fraudulent Equipment, namely, a CTU for 21 days and a CPM for 4 to 6 weeks despite the fact that he did <u>not perform</u> the arthroscopic procedure. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to AM.

- On December 5, 2019, an Insured AL ███████████ was purportedly involved in a motor vehicle accident. On August 24, 2020, Dr. Berkowitz purportedly performed an arthroscopic procedure on AL's left shoulder at a surgical center in Brooklyn, New York. Dr. Berkowitz purportedly issued an <u>undated</u> prescription form for Fraudulent Equipment, namely, a CTU for 14 days. Dr. Berkowitz also purportedly issued a <u>second</u> pre-printed prescription form – relating to the same arthroscopic procedure – for a CTU and CPM for 4 weeks. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to AL despite the fact that multiple prescriptions were issued for a CTU with different rental periods.

- On June 23, 2020, an Insureds MS ███████████ was purportedly involved in a motor vehicle accident. On August 26, 2020, Dr. Berkowitz

purportedly performed an arthroscopic procedure on MS's left shoulder at a surgical center in Jersey City, New Jersey. Dr. Berkowitz purportedly issued an <u>undated</u> prescription form for Fraudulent Equipment, namely, a left shoulder CTU for 14 days. Dr. Berkowitz also purportedly issued a <u>second</u> pre-printed prescription form – relating to the arthroscopic procedure – for a CTU and CPM for 4 weeks.  The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment to MS despite the fact that multiple prescriptions were issued for a CTU with different rental periods.

- On July 21, 2019, an Insured named NN ████████████ was purportedly involved in a motor vehicle accident. On October 14, 2020, Richard E. Pearl, M.D. ("Dr. Pearl") purportedly performed an arthroscopic surgery on NN's right knee at a surgical center in Brooklyn, New York. Dr. Pearl purportedly issued <u>undated</u> pre-printed prescription forms for Fraudulent Equipment to NN, namely, a CTU for 21 days and a CPM (without any indication as to which knee) for 4 to 6 weeks. Dr. Pearl also purportedly issued a pre-printed prescription form for a DVT. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment to NN. In the addition to the aforementioned Fraudulent Equipment, Town Supply also dispensed a synthetic sheepskin pad to NN but failed to submit a copy of a prescription as part of its billing to GEICO.

- On February 23, 2020, an Insured named RB ████████████ was purportedly involved in a motor vehicle accident. On July 28, 2020, Aleksandr Khaimov, D.O. ("Dr. Khaimov") purportedly performed an arthroscopic surgery on RB's right knee at a surgical center in Rockaway Beach, New York. Dr. Khaimov purportedly issued a pre-printed prescription form for Fraudulent Equipment, namely, a CTU, CPM, and DVT for 3 to 4 weeks. The prescription was provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment to RB.  In the addition to the aforementioned Fraudulent Equipment, Town Supply also dispensed a synthetic sheepskin pad to RB but failed submit a copy of a prescription as part of its billing to GEICO.

- On June 30, 2020, an Insured named AW ████████████ was purportedly involved in a motor vehicle accident. On August 24, 2020, Dr. Berkowitz purportedly performed an arthroscopic surgery on AW's right knee at a surgical center in Brooklyn, New York. Dr. Berkowitz purportedly issued pre-printed prescription forms for Fraudulent Equipment, namely, a CTU and DVT for 2 weeks. Dr. Berkowitz also purportedly issued a third prescription – relating to the same arthroscopic procedure – for a CTU and CPM for 4 weeks. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to AW despite the fact that multiple prescriptions were issued for a CTU with different rental periods. In addition to the aforementioned Fraudulent Equipment, Town

Supply also dispensed a synthetic sheepskin pad to AW but failed to submit a copy of a prescription as part of its billing to GEICO.

- On April 2, 2020, an Insured named AB ▮▮▮▮▮ was purportedly involved in a motor vehicle accident. On August 18, 2020, Christopher Durant, M.D. ("Dr. Durant") purportedly performed an arthroscopic surgery on AB's right knee at a surgical center in Brooklyn, New York. Dr. Durant purportedly issued undated pre-printed prescription forms for Fraudulent Equipment, namely, a DVT for 2 weeks, a CTU for 3 weeks, and a CPM for 4 weeks. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to AB. In addition to the aforementioned Fraudulent Equipment, Town Supply also dispensed a synthetic sheepskin pad to AB but failed to submit a copy of a prescription as part of its billing to GEICO.

- On March 5, 2020, an Insured named JD ▮▮▮▮▮ was purportedly involved in a motor vehicle accident. On August 26, 2020, Laxmidhar Diwan, M.D. ("Dr. Diwan") purportedly performed an arthroscopic surgery on JD's left knee at a surgical center in Rockaway Park, New York.  Dr. Diwan purportedly issued pre-printed prescription forms for Fraudulent Equipment, namely, a CTU, CPM, and DVT for 4 to 6 weeks. The prescription for a CTU did not indicate for which body part it was intended for. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to JD. In addition to the aforementioned Fraudulent Equipment, Town Supply also dispensed a synthetic sheepskin pad to JD but failed to submit a copy of a prescription as part of its billing to GEICO.

102.	These are only representative examples. In fact, all of the Insureds identified in Exhibit "1" that received prescriptions for Fraudulent Equipment after a surgical procedure received virtually identical prescriptions to the ones identified above pursuant to predetermined fraudulent protocol with others who are not presently identifiable.

103.	In keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were part of predetermined fraudulent protocol – and not based upon medical necessity – the Defendants regularly dispensed Fraudulent Equipment based upon pre-printed prescriptions forms containing a stamped or photocopied signature or initials. The Defendants used

26

these prescriptions as the basis to support the fraudulent charges identified in Exhibit "1". Attached hereto as Exhibit "2".

104.    For example, many of the prescriptions used to support the charges identified in Exhibit "1" that were purportedly issued by William K. King ("Dr. King") were actually duplicated forms with Dr. King's signature previously filled out but contained the names of various Insureds. Attached hereto as Exhibit "3".

105.    Moreover, pursuant to predetermined fraudulent protocols and unlawful financial arrangements, the Referring Providers routinely issued prescriptions for a specific set of Fraudulent Equipment to each patient that were thereafter steered to and filled by Town Supply and Right Choice, in order to conceal the voluminous billing submitted to GEICO for each patient for medically unnecessary Fraudulent Equipment. Notably, in many instances, the pre-printed prescriptions forms submitted to GEICO by Town Supply and Right Choice contained different signatures despite the fact that they were purportedly issued by a single Referring Provider. For example:

- On April 23, 2020, an Insured named ZA ███████████ was purportedly involved in a motor vehicle accident. On August 28, 2020, Dr. Ajoy K. Sinha purportedly performed an arthroscopic procedure on ZA's left shoulder at a surgical center in New York, New York. Dr. Upendra K. Sinha – who did not perform the arthroscopic procedure – purportedly issued <u>undated</u> pre-printed prescription forms for Fraudulent Equipment, namely, a CTU for 21 days and a CPM for 6 weeks. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to ZA. Moreover, on August 28, 2020, Dr. Ajoy K. Sinha purportedly issued a pre-printed prescription form for a post-op shoulder brace which was billed through Right Choice.

- On December 16, 2020, an Insured named LP ███████████ was purportedly involved in a motor vehicle accident. On February 12, 2021, Anjani Sinha, M.D. ("Dr. Anjani Sinha") purportedly performed an arthroscopic procedure on LP's right shoulder at a surgical center in Brooklyn, New York. Dr. Anjani Sinha purportedly issued <u>undated</u> pre-printed prescription forms for

Fraudulent Equipment, namely, a CTU and a CPM for 4 to 6 weeks. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to LP. Moreover, on February 12, 2021, Dr. Anjani Sinha also purportedly issued a pre-printed prescription form for a post-op shoulder brace which was billed through Right Choice. Notably, the pre-printed prescriptions forms submitted to GEICO by Town Supply and Right Choice contained purported signatures of Dr. Anjani Sinha that do not match.

- On December 16, 2020, an Insured named MZY            ) was purportedly involved in a motor vehicle accident. On February 12, 2021, Dr Anjani Sinha purportedly performed an arthroscopic procedure on MZY's left shoulder at a surgical center in Brooklyn, New York. Dr. Anjani Sinha purportedly issued <u>undated</u> pre-printed prescription forms for Fraudulent Equipment, namely, a CTU and a CPM for 4 to 6 weeks. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented MZY. Moreover, on February 12, 2021, Dr. Anjani Sinha also purportedly issued a pre-printed prescription form for a post-op shoulder brace which was billed through Right Choice. Notably, the pre-printed prescriptions forms submitted to GEICO by Town Supply and Right Choice contained purported signatures of Dr. Anjani Sinha that do not match.

- On October 20, 2020, an Insured LM named        was purportedly involved in a motor vehicle accident. On February 12, 2021, Dr. Ajoy K. Sinha purportedly performed an arthroscopic procedure on LM's left shoulder at a surgical center in New York, New York. Dr. Ajoy K. Sinha purportedly issued <u>undated</u> pre-printed prescription forms for Fraudulent Equipment, namely, a CTU for 21 days and a CPM for 6 weeks. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to LM. Moreover, on February 12, 2021, Dr. Ajoy K. Sinha purportedly also issued a pre-printed prescription form for a post-op shoulder brace which was billed through Right Choice. Notably, the pre-printed prescriptions forms submitted to GEICO by Town Supply and Right Choice contained purported signatures of Dr. Ajoy K. Sinha that do not match.

- On September 10, 2020, an Insured named LB          was purportedly involved in a motor vehicle accident. On March 22, 2021, Dr. Upendra K. Sinha purportedly performed an arthroscopic procedure on LB's left shoulder at a surgical center in Saddle Brook, New Jersey. Dr. Upendra K. Sinha purportedly issued <u>undated</u> pre-printed prescription forms for Fraudulent Equipment, namely, a CTU for 21 days and a CPM for 6 weeks. The prescriptions were provided to the Defendants and used by the Defendants to

bill GEICO for Fraudulent Equipment that was provided and rented to LB. Moreover, on March 22, 2021, Dr. Upendra K. Sinha purportedly also issued a pre-printed prescription form for a post-op shoulder brace which was billed through Right Choice. Notably, the pre-printed prescriptions forms submitted to GEICO by Town Supply and Right Choice contained purported signatures of Dr. Upendra K. Sinha that do not match.

- On April 11, 2020, an Insured named ZI ██████████ was purportedly involved in a motor vehicle accident. On August 28, 2020, Dr. Ajoy K. Sinha purportedly performed an arthroscopic procedure on ZI's left knee at a surgical center in New York, New York.  Dr. Upendra K. Sinha (who did not perform the arthroscopic procedure) purportedly issued <u>undated</u> pre-printed prescription forms for Fraudulent Equipment, namely, a CTU for 21 days and a CPM for 6 weeks. On August 28, 2020, Dr. Upendra K. Sinha also purportedly issued a pre-printed prescription for a DVT for 2 weeks. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to ZI.  In addition to the aforementioned Fraudulent Equipment, Town Supply also billed for a synthetic sheepskin pad for ZI but failed to submit a copy of a prescription as part of its billing to GEICO. Moreover, on August 28, 2020, Dr. Ajoy K. Sinha purportedly issued a pre-printed prescription form for a ROM hinged knee brace and an adjustable cane which were billed through Right Choice.

- On December 9, 2020, an Insured named DC ████████ was purportedly involved in a motor vehicle accident. On April 5, 2021, Dr. Upendra K. Sinha purportedly performed an arthroscopic procedure on DC's right shoulder at a surgical center in Brooklyn, New York. Dr. Upendra K. Sinha purportedly issued <u>undated</u> pre-printed prescription forms for Fraudulent Equipment, namely, a CTU for 21 days and a CPM for 6 weeks. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to DC. Moreover, on April 5, 2021, Dr. Upendra K. Sinha also purportedly issued a pre-printed prescription form for a post-op shoulder brace which was billed through Right Choice. Notably, the pre-printed prescriptions forms submitted to GEICO by Town Supply and Right Choice contained purported signatures of Dr. Upendra K. Sinha that do not match.

- On September 19, 2020, an Insured named RP ██████████ was purportedly involved in a motor vehicle accident.  On January 8, 2021, Dr. Upendra K. Sinha purportedly performed an arthroscopic procedure on RP's left knee at a surgical center in New York, New York. Dr. Upendra Sinha purportedly issued <u>undated</u> pre-printed prescription forms for Fraudulent Equipment, namely, a CTU for 21 days and a CPM for 6 weeks. On January 8, 2021, Dr. Upendra K. Sinha also purportedly issued a pre-printed prescription

for a DVT for the "left/right knee" for 2 weeks without any further instruction. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to RP. Moreover, on January 8, 2021, Dr. Upendra K. Sinha purportedly also issued a pre-printed prescription form for a ROM hinged knee brace and an adjustable cane which were billed through Right Choice. Notably, the pre-printed prescriptions forms submitted to GEICO by Town Supply and Right Choice contained purported signatures of Dr. Upendra K. Sinha that do not match. Further, the prescription form submitted by Right Choice contains a pre-printed section with Dr. Upendra K. Sinha's name and license information, but it misspells her name as "Uprenda Sinja, MD" (Town Supply and Right Choice's prescriptions contain the same license number).

- On October 19, 2020, an Insured named EV ▇▇▇▇▇▇ was purportedly involved in a motor vehicle accident. On November 20, 2020, Dr. Durant purportedly performed an arthroscopic procedure on EV's right shoulder at a surgical center in Rockaway Park, New York. In connection with the arthroscopic procedure, an <u>undated</u> pre-printed prescription form was issued for a CTU for 3 weeks and a CPM for 6 weeks despite the fact that there is no signature or license number identifying who issued the prescription. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to EV. Further, on November 20, 2020, Dr. Durant purportedly issued a pre-printed prescription form for a post-op shoulder brace which was billed through Right Choice.

- On October 19, 2020, an Insured named EW ▇▇▇▇▇▇ was purportedly involved in a motor vehicle accident. On November 20, 2020, Dr. Durant purportedly performed an arthroscopic procedure on EW's right shoulder at a surgical center in Rockaway Park, New York. In connection with the arthroscopic procedure, an <u>undated</u> pre-printed prescription form was issued for a CTU for 3 weeks and a CPM for 6 weeks despite the fact that there is no signature or license identifying who issued the prescription. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to EW.  On November 20, 2020, Dr. Durant purportedly issued a pre-printed prescription form for a post-op shoulder brace which was billed through Right Choice.

- On September 27, 2020, an Insured named NG ▇▇▇▇▇▇ was purportedly involved in a motor vehicle accident. On November 20, 2020, Dr. Durant purportedly performed an arthroscopic procedure on NG's left shoulder at a surgical center in Rockaway Park, New York. In connection with the arthroscopic procedure, a signed <u>undated</u> pre-printed prescription form was issued for Fraudulent Equipment, namely, a CTU for 21 days and a CPM for 6

weeks. The prescription was provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to NG. Moreover, on November 20, 2020, Dr. Durant purportedly issued a pre-printed prescription form for a post-op shoulder brace which was billed through Right Choice. Notably, the pre-printed prescriptions forms submitted to GEICO by Town Supply and Right Choice contained signatures that do not match.

- On November 14, 2019, an Insured named SA ███████████████ was purportedly involved in a motor vehicle accident. On November 19, 2020, Dr. Khaimov purportedly performed an arthroscopic procedure on SA's right shoulder at a surgical center in Brooklyn, New York. Dr. Khaimov purportedly issued a pre-printed prescription form for Fraudulent Equipment, namely, a CTU for 3 to 4 weeks and a CPM for 4 to 6 weeks. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to SA. Moreover, on November 19, 2020, Dr. Khaimov also purportedly issued a issued a pre-printed prescription form for a post-op shoulder brace which was billed through Right Choice. Notably, the pre-printed prescriptions forms submitted to GEICO by Town Supply and Right Choice contained signatures that do not match.

- On January 24, 2020, an Insured named AM ██████████████ was purportedly involved in a motor vehicle accident. On September 3, 2020, Dr. Khaimov purportedly performed an arthroscopic procedure on AM's left knee at a surgical center in Brooklyn, New York. Dr. Khaimov purportedly issued a pre-printed prescription form for Fraudulent Equipment, namely, a CTU and DVT for 3 to 4 weeks and a CPM for 4 to 6 weeks. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to AM. In addition to the aforementioned Fraudulent Equipment, Town Supply also dispensed a synthetic sheepskin pad to AM but failed to submit a copy of a prescription as part of its billing to GEICO. On September 3, 2020, Dr. Khaimov also purportedly issued a pre-printed prescription form for a ROM hinged knee brace and an adjustable cane which was billed through Right Choice. Notably, the pre-printed prescriptions forms submitted to GEICO by Town Supply and Right Choice contained signatures that do not match.

- On January 28, 2021, an Insured named RJ █████████ was purportedly involved in a motor vehicle accident. On March 21, 2021, William L. King, M.D. ("Dr. King") purportedly performed an arthroscopic procedure on RJ's left shoulder at a surgical center in Brooklyn, New York. Dr. King purportedly issued <u>undated</u> pre-printed prescription forms for Fraudulent Equipment, namely, a CTU for 28 days and a CPM for 4 to 6 weeks. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for

Fraudulent Equipment that was provided and rented to RJ.  On March 21, 2021, Dr. King also purportedly issued a pre-printed prescription form for a post-op shoulder brace which was billed through Right Choice.  Notably, the pre-printed prescriptions forms submitted to GEICO by Town Supply and Right Choice contained signatures that do not match.

- On January 28, 2021, an Insured named CA ███████ was purportedly involved in a motor vehicle accident. On March 21, 2021, Dr. King purportedly performed an arthroscopic procedure on CA's right shoulder at a surgical center in Brooklyn, New York. Dr. King purportedly issued <u>undated</u> pre-printed prescription forms for Fraudulent Equipment, namely, a CTU for 28 days and a CPM for 4 to 6 weeks. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to CA.  On March 21, 2021, Dr. King also purportedly issued a pre-printed prescription form for a post-op shoulder brace which was billed through Right Choice. Notably, the pre-printed prescriptions forms submitted to GEICO by Town Supply and Right Choice contained signatures that do not match.

- On September 5, 2020, an Insured named LP ███████ was purportedly involved in a motor vehicle accident. On May 23, 2021, Dr. King purportedly performed an arthroscopic procedure on LP's right shoulder at a surgical center in Brooklyn, New York. Dr. King purportedly issued <u>undated</u> pre-printed prescription forms for Fraudulent Equipment, namely, a CTU for 28 days and a CPM for 4 to 6 weeks. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to LP. Moreover, on May 23, 2021, Dr. King purportedly also issued a pre-printed prescription form for a post-op shoulder brace which was billed through Right Choice. Notably, the pre-printed prescriptions forms submitted to GEICO by Town Supply and Right Choice contained purported signatures of Dr. King that do not match.

- On August 10, 2020, an Insured named AD ███████ was purportedly involved in a motor vehicle accident. On December 2, 2020, Dr. Pearl purportedly performed an arthroscopic procedure on AD's right shoulder at a surgical center in Brooklyn, New York.  Dr. Pearl purportedly issued <u>undated</u> pre-printed prescription forms for Fraudulent Equipment, namely, a CTU for 21 days and a CPM for 4 to 6 weeks. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to AD. Moreover, on December 2, 2020, Dr. Pearl also purportedly issued a pre-printed prescription form for a post-op shoulder brace which was billed through Right Choice.

- On December 30, 2019, an Insured named AM ███████ was purportedly involved in a motor vehicle accident. On August 12, 2020, Dr. Pearl purportedly performed an arthroscopic procedure on AM's right knee at a surgical center in Brooklyn, New York. Dr. Pearl purportedly issued <u>undated</u> pre-printed prescription forms for Fraudulent Equipment, namely, a CTU for 21 days and a CPM for 4 to 6 weeks. On August 12, 2020, AM also purportedly issued a prescription for a DVT for 2 weeks. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to AM. Notably, the prescription for a DVT failed to indicate for which knee the equipment was purportedly prescribed for. Moreover, on August 12, 2020, Dr. Pearl also purportedly issued a pre-printed prescription form for a ROM hinged knee brace and crutches which was billed through Right Choice.

- On June 2, 2020, an Insured named OS ███████ was purportedly involved in a motor vehicle accident. On August 12, 2020, Dr. Pearl purportedly performed an arthroscopic procedure on OS's left knee at a surgical center in Brooklyn, New York. Dr. Pearl purportedly issued <u>undated</u> pre-printed prescription forms for Fraudulent Equipment, namely, a CTU for 21 days and a CPM for 4 to 6 weeks. On August 12, 2020, Dr. Pearl purportedly issued a pre-printed prescription form for a DVT for 2 weeks but failed to indicate for which knee the equipment was purportedly prescribed for. The prescriptions were provided to the Defendants and used by the Defendants to bill GEICO for Fraudulent Equipment that was provided and rented to OS. Moreover, on August 12, 2020, Dr. Pearl also purportedly issued a pre-printed prescription form for a ROM hinged knee brace and an adjustable cane which was billed through Right Choice.

106.    In further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were part of a predetermined fraudulent protocol, the prescribed Fraudulent Equipment were not medically necessary.

107.    In a legitimate setting, there are only a limited number of circumstances where CPMs are medically necessary to aid in a patient's recovery. A CPM is a machine that provides joint movement without active contraction of muscle groups, with the goal of increasing range of motion and promotion healing of joint surfaces. Circumstances where CPMs could be medically necessary include patient recovery after a total replacement of a patient's knee or shoulder, or surgery to repair an anterior cruciate ligament.

108.    Moreover, again in a legitimate setting, CPMs are not provided when patients undergo minimally invasive surgical procedures such as an arthroscopic surgery and when the patients can undergo traditional physical therapy. This is due to: (i) the ability for physical therapy to provide long-term benefits when CPMs cannot; and (ii) regularly accepted medical studies that have concluded the use of CPMs in post-operative recovery do not provide any short-term or long-term benefit.

109.    In support of the fact that the CPMs are medically necessary after arthroscopic surgeries, an evidence-based study on rehabilitation after arthroscopic rotator cuff repair revealed that there is no significant difference in the outcome of patients who used CPMs for three to four weeks after surgery compared to those who did not use CPMs for the same period.

110.    In support of the limited uses of CPMs, the Centers for Medicare and Medicaid Services issued a National Coverage Determination concluding that CPMs are only considered necessary after: (i) total knee arthroplasty; (ii) anterior cruciate ligament repair/reconstruction; (iii) during the non-weight-bearing period to promote healing after cartilage grafting procedures; and (iv) surgical release of arthrofibrosis of any joint.

111.    Consistent with limited uses of CPMs by the Centers for Medicare and Medicaid Services, the American Academy of Orthopedic Surgeons ("AAOS") issued clinical practice guidance that the use of CPMs in total knee replacement does not improve outcomes. Even more, AAOS clinic practice guidelines for rotator cuff and anterior cruciate ligament repairs do not even address the use of CPMs as part of the rehabilitative process.

112.    Unlike the Insureds identified in Exhibit "1" who were issued prescriptions for CPMs typically after an arthroscopic procedure, patients who undergo serious knee or shoulder

surgery may have some short-term benefits by using CPMs to aid in quicker range of motion recovery.

113.   To the extent that CPMs are medically appropriate, in a legitimate setting, CPMs will be prescribed for only a short-term period that is typically less than two weeks. Long term usage of CPMs – such as four to six weeks – will not legitimately be prescribed as there is no evidence that the long-term use of CPMs provide any benefit to patients.

114.   Additionally, in a legitimate setting, a patient would need a specific medical co-morbidity necessitating the need for a CPM, and the co-morbidity would be documented pre-operatively to indicate the necessity of a CPM.

115.   It is improbable that a legitimate healthcare provider would issue a prescription for a CPM to a patient post-arthroscopic surgery – let alone for up to four to six weeks of use – when that patient is ambulatory, is able to undergo traditional physical therapy, and does not have a notated co-morbidity necessitating the need for a CPM.

116.   In keeping with the fact that the CPMs prescribed to the Insureds identified in Exhibit "1" were not medically necessary, and were provided pursuant to a predetermined fraudulent protocol, the Insureds identified in Exhibit "1" were typically issued CPMs by the Defendants for four to six weeks at a time after arthroscopic surgeries when the Insureds were able to and did undergo traditional physical therapy.

117.   Furthermore, and in keeping with the fact that the CPMs prescribed to the Insureds identified in Exhibit "1" were medically unnecessary and were provided pursuant to a predetermined fraudulent protocol, contemporaneously dated medical records, such as the surgical records failed to identify and never explained the necessity of the prescriptions for CPMs that were used by the Defendants to submit charges to GEICO.

35

118.    Even if the CPMs that were prescribed to the Insureds identified in Exhibit "1" were medically appropriate, the four to six week rental periods for the CPMs prescribed to the Insureds by the Referring Providers exceeded medical utility and did not comport with generally accepted medical guidelines, including the AAOS, which does not recommend them in the context prescribed to the Insureds identified in Exhibit "1".

119.    Similarly, the CTUs that were prescribed and issued to the Insureds identified in Exhibit "1" were not medically necessary and were provided pursuant to a predetermined fraudulent protocol because they did not provide any additional medical benefit to Insureds.

120.    As indicated in the prescription forms purportedly issued by the Referring Providers at the No-Fault Clinics, the CTUs were mainly to be used for compression therapy and cold therapy.

121.    When a patient suffers from sprains and strains as part of a minor automobile accident, the patient's sprains and strains will virtually always resolve after a short course of conservative treatment such as rest, ice, compression, and elevation, which include using ice-packs and placing an elastic bandage to provide compression.

122.    When used for cold therapy, the CTUs dispensed by the Defendants effectively functioned as an icepack. When used for compression therapy, the CTUs dispensed by the Defendants effectively functioned as an ACE bandage.

123.    Collectively, the CTUs dispensed by the Defendants for compression and cold therapy essentially provide cold to a part of the patient's body, which is not more effective than using a standard ice pack and bandage.

124.    Where a patient is in a position to be able to place an icepack and is able to use an elastic bandage for compression, there is no medically necessary reason to use a CTU. This is

36

especially true considering that medical studies have shown no difference in recovery or functionality of patients using a CTU compared to an ice pack.

125.    Moreover, the use of cold therapy – either in the form of an ice pack or a CTU – subsequent to trauma to decrease swelling, is only effective during the first few days.

126.    After the first few days, cold therapy is only helpful to patients immediately after range of motion exercises performed during physical therapy. In that limited scenario, cold therapy is typically provided by the physical therapist in the form of ice packs.

127.    It is improbable that a legitimate physician would issue a prescription for a CTU to a patient post-motor vehicle accident – let alone for three or four weeks of use – when the patient is able to use ice-packs and is undergoing outpatient physical therapy.

128.    In further keeping with the fact that the CTUs prescribed to the Insureds identified in Exhibit "1" were not medically necessary, and were provided pursuant to predetermined fraudulent protocols, the Insureds identified in Exhibit "1" were virtually always prescribed the CTUs for weeks at a time when there was no objective evidence that the Insureds were unable to use an ice pack or compression bandage.

129.    Furthermore, and in keeping with the fact that the CTUs prescribed to the Insureds identified in Exhibit "1" after surgery were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the contemporaneously dated medical records, such as the surgical records failed to identify and explain the medical necessity of the prescriptions for CTUs that were used by the Defendants to submit charges to GEICO.

130.    In a legitimate setting, when a patient returns for a follow-up examination after being prescribed DME and/or OD, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME and/or OD aided the patient's subjective

37

complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME and/or OD or newly issued DME and/or OD.

131.    However, the post-surgical reports from Referring Providers failed to include any meaningful information regarding the Fraudulent Equipment prescribed to the Insureds subsequent to the arthroscopic procedures.

132.    Even if the CTUs that were prescribed to the Insureds identified in Exhibit "1" were medically appropriate, the length of use for the CTUs prescribed to the Insureds by the Referring Providers exceeded medical utility and did not comport with generally accepted medical guidelines.

133.    To a lesser extent, the Referring Providers also prescribed DVTs to Insureds that were medically unnecessary and solely prescribed and dispensed to inflate the Defendants' billing to GEICO.

134.    In a legitimate setting, a DVT Device is used to mitigate a patient's risk for suffering from deep vein thrombosis ("DVT") after a surgical procedure by compressing air to a limb, such as a leg or arm, in order to create blood flow. DVT is when there is a blood clot in a vein, which can lead to potentially life-threatening circumstances if the blood clot travels to the heart, i.e., a pulmonary embolism. The purpose of the DVT Device is to create blood flow in a limb when the patient is unlikely to be able to do it on his or her own.

135.    Not all patients who undergo surgical procedures are at a real risk for DVT such that a prescription for a DVT Device is medically necessary. There are many factors that play a role into whether a patient is at risk for DVT, thus necessitating the use of a DVT Device. For

example: (i) family medical history; (ii) history of smoking, heart-disease, or cancer; (iii) obesity; (iv) age; (v) the ability to be ambulatory; and (vi) the type of surgical procedure.

136.    In a legitimate setting, physicians have to assess each patient's risk factor for DVT and determine whether they are in the category of a high risk, moderate risk, or low risk for DVT.

137.    There are certain surgical procedures that automatically increase the risk for DVT. For example, a total knee replacement, or a total hip replacement will automatically cause patients to be in a higher-risk category because of the length of time during the recovery that the patient is not ambulatory. By contrast, arthroscopic knee surgeries are at a low-risk for DVT due to the typical post-surgical recovery.

138.    Furthermore, surgical procedures of the upper body, especially the shoulder, also pose a low-risk for developing DVT. Even more, arthroscopic shoulder surgeries pose an extremely low-risk for developing DVT.

139.    In circumstances where the patient underwent an arthroscopic surgery of a knee, as did certain of the Insureds identified in Exhibit "1", a physician will only legitimately prescribe a DVT Device to aid in preventing DVT if the patient has multiple other factors that significantly increase their risk for DVT.

140.    In keeping with the fact that the prescriptions for DVT Devices issued to the Insureds identified in Exhibit "1" were not medically necessary, and were provided pursuant to a predetermined fraudulent protocol, the Insureds identified in Exhibit "1" who were prescribed DVT Devices were virtually always low risk for developing DVT after their surgical procedures.

141.    Moreover, virtually all insureds who received a DVT Device simultaneously underwent physical therapy, a further indication that they were not at risk of developing deep vein blood clots.

142.    In reality, for the reasons set forth above, all of the charges for Fraudulent Equipment identified in Exhibit "1" were not medically necessary and were provided as part of predetermined fraudulent protocols. As such, the Defendants were never eligible for reimbursement of No-Fault Benefits.

### D.    The Defendants' Fraudulent Billing

143.    The bills for Fraudulent Equipment submitted by the Defendants to GEICO and other New York automobile insurers fraudulently misrepresented that they were for reasonable and medically necessary items when the prescriptions for Fraudulent Equipment were based – not upon medical necessity but – solely on predetermined fraudulent protocols and unlawful financial arrangements between the Defendants and others who are not presently known.

144.    Moreover, the bills for Fraudulent Equipment submitted by the Defendants to GEICO and other New York automobile insurers contained charges for rental equipment that fraudulently misrepresented the reimbursement rates were permissible, when they were not.

145.    More specifically, the bills submitted to GEICO by the Defendants fraudulently misrepresented that the charges submitted to GEICO for the DME that was purportedly provided and rented to Insureds were permissible under the No-Fault Laws.

146.    As stated above, the New York Fee Schedule sets forth a maximum permissible rental charge, on a monthly basis, for renting equipment, supplies and services. For Fee Schedule items, the total monthly rental charges for equipment, supplies, and services, is no greater than 10% of the listed maximum reimbursement amount or 10% of the DME/OD supplier's actual acquisition cost. For Non-Fee Schedule items, which includes the Fraudulent Equipment, the total monthly rental charges for equipment, supplies, and services is no greater than the average monthly cost to the general public.

147.    When the Defendants submitted bills to GEICO seeking payment for the Fraudulent Equipment, each of the charges identified HCPCS Codes for either Fee Schedule items or Non-Fee Schedule items that described the items purportedly provided and rented to the Insureds.

148.    For all of the charges identified in Exhibit "1" for providing and renting Non-Fee Schedule items, which included CPMs billed under HCPCS Codes E0935 and E0936 and CTUs billed under HCPCS Code E0236, the Defendants fraudulently misrepresented that the charges were no greater than the maximum permissible amount.

149.    For example, and as set forth in Exhibit "1," when the Defendants submitted bills to GEICO using HCPCS Code E0935 for purportedly renting Insureds knee CPMs for a period of 27 to 28 days, the Defendants fraudulently misrepresented that they were able to collect about $65.01 to $67.41 per day for each device provided to an Insured.

150.    Additionally, and as also set forth in Exhibit "1," when the Defendants submitted bills to GEICO using HCPCS Code E0936 for purportedly renting Insureds shoulder CPMs for a period of 20 to 21 days, the Defendants fraudulently misrepresented that they were able to collect between $75 and $78.75 per day for each device provided to an Insured.

151.    However, each of the charges submitted by the Defendants for CPMs, under HCPCS Codes E0935 and E0936, fraudulently misrepresented the maximum reimbursement amount for the rental of CPMs as the cost to the public for the same type of device was only a fraction of what was charged to GEICO.

152.    Although the Defendants charged GEICO about $65.01 to $67.41 per day for each knee CPM rented to Insureds, knee CPMs were available for rent by the general public at drastically lower rates via internet websites, such as through: (i) medcomgroup.com for between $575.00 and $625.00, depending upon the brand, for a four-week rental, which is the equivalent

41

of between $20.54 and $22.32 per day; and (ii) a local homecare supply store called Greenvale Homecare, which is located in Greenvale, New York for $600.00 for a four-week rental, which is the equivalent of $21.43 per day.

153.    In virtually all the charges submitted to GEICO for the rental of knee CPMs using HCPCS Code E0935, the Defendants fraudulently misrepresented that the maximum reimbursement rate was about $65.01 to $67.41 per day when the maximum reimbursement was no greater than the price available to the general public, which is no greater than $22.32 per day.

154.    As an additional example, and as set forth in Exhibit "1", when the Defendants submitted bills to GEICO using HCPCS Code E0236 for purportedly renting CTUs to Insureds – to the extent that the DME was actually provided to Insureds – the Defendants fraudulently misrepresented that they were able to collect about $42.89 to $46.89 per day for each device provided to an Insured.

155.    However, each of the charges submitted by the Defendants for CTUs under HCPCS Code E0236 fraudulently misrepresented the maximum reimbursement amount for the rental of these pumps as the cost to the public for a similar type of device was only a fraction of what was charged to GEICO.

156.    Although the Defendants charged GEICO $42.89 to $46.89 per day for each CTU device rented to Insureds, similar CTUs were available for rent by the general public at drastically lower rates via a local homecare supply store called Greenvale Homecare, which is located in Greenvale, New York for $120.00 for one month, which is the equivalent of $4.00 per day.

157.    In keeping with the fact that the rental charges of $300.23 to $328.23 per week by the Defendants for CTUs under HCPCS Code E0236 were grossly above the maximum

reimbursement charges submitted to GEICO and submitted solely to increase the amount of No-Fault Benefits that the Defendants could receive.

158.    In virtually all the charges submitted to GEICO for the rental of CTUs under HCPCS Code E0236, the Defendants fraudulently misrepresented that the maximum reimbursement rate was $42.89 to $46.89 per day when the maximum reimbursement was no greater that the price available to the general public, which is no greater than $4.00 per day.

159.    In an effort to further their scheme, upon information and belief, the Defendants purposefully avoided researching the cost to the general public of the Fraudulent Equipment purportedly provided to the Insureds because they knew the items they rented cost significantly less to the general public than the amounts they charged and submitted to GEICO and other automobile insurers.

160.    In each of the claims identified within Exhibit "1", the Defendants fraudulently misrepresented in the bills submitted to GEICO that the charges for Fraudulent Equipment were for the permissible reimbursement amounts when they fraudulent and significantly inflated the permissible reimbursement rates for the Fraudulent Equipment, and therefore were not eligible to collect No-Fault Benefits in the first instance.

### III.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

161.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms, HCFA-1500 forms, and/or treatment reports to GEICO through and in the name of Town Supply, seeking payment for Fraudulent Equipment.

162.     The NF-3 forms, HCFA-1500 forms and treatment reports that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

    (i)    The NF-3 forms, HCFA-1500 forms, treatment reports, and prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME and/or OD, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any of the Fraudulent Equipment, it was based upon: (a) unlawful financial arrangements with others who are not presently identifiable; and (b) predetermined fraudulent protocols without regard for the medical necessity of the items.

    (ii)    The NF-3 forms, HCFA-1500 forms, treatment reports, and prescriptions uniformly misrepresented to GEICO the proper reimbursement amount for Fraudulent Equipment provided to the Insureds, to the extent that Town Supply provided any Fraudulent Equipment, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent any Fraudulent Equipment was provided – the bills falsified that the charges to GEICO were less than or equal to the maximum permissible reimbursement amount for Fraudulent Equipment identified in the NF-3 forms, HCFA-1500 forms, treatment reports, and prescriptions.

## IV.     **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

163.     The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

164.     To induce GEICO to promptly pay the fraudulent charges for Fraudulent Equipment, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

165.     Specifically, they knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were not based upon medical necessity but rather based upon predetermined fraudulent protocols as a result of unlawful financial arrangements, were provided to Town Supply,

and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment was billed to GEICO for financial gain.

166.    Additionally, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon predetermined protocols and without medical necessity in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

167.    Lastly, the Defendants knowingly misrepresented the permissible reimbursement amount of the Fraudulent Equipment contained in the bills submitted by the Defendants to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

168.    GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

169.    In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the defendants (yet, GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

170.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

45

171.     GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $460,000.00 based upon the fraudulent charges.

172.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against Town Supply**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

173.     GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 172 of this Complaint as if fully set forth at length herein.

174.     There is an actual case in controversy between GEICO and Town Supply regarding more than $1,600,000.00 in fraudulent billing that has been submitted to GEICO in the name of Town Supply.

175.     Town Supply has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were based – not upon medical necessity but – as a result of its participation in unlawful financial arrangements.

176.     Town Supply also has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO were based – not upon medical necessity but – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants and others who are not presently known, rather than to treat the Insureds.

46

177.    Town Supply has no right to receive payment for any pending bills submitted to GEICO because – to the extent that Town Supply provided any Fraudulent Equipment –Town Supply fraudulently misrepresented that the charges for Fraudulent Equipment contained within the bills were for permissible reimbursement amounts.

178.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of Town Supply.

<strong><u>SECOND CAUSE OF ACTION</u></strong><br><strong>Against Izrayev</strong><br><strong>(Violation of RICO, 18 U.S.C. § 1962(c))</strong>

179.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 172 of this Complaint as if fully set forth at length herein.

180.    Town Supply is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

181.    Izrayev knowingly conducted and/or participated, directly or indirectly, in the conduct of Town Supply's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Town Supply was not eligible to receive under the New York No-Fault Laws because: (i) Town Supply submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (ii) Town Supply submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity – that are designed solely to financially enrich

the Defendants and others presently not known; and (iii) to the extent that Town Supply actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the permissible reimbursement amount for the Fraudulent Equipment. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

182.    Town Supply's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Izrayev operates Town Supply, insofar as Town Supply is not engaged as a legitimate supplier of DME and/or OD, and therefore, acts of mail fraud are essential in order for Town Supply to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Izrayev continues to submit and attempt collection on the fraudulent billing submitted by Town Supply to the present day.

183.    Town Supply is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Town Supply in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

184.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $460,000.00 pursuant to the fraudulent bills submitted through Town Supply.

185.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against Izrayev and John Doe Defendants 1-10**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

186.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 172 of this Complaint as if fully set forth at length herein.

187.    Town Supply is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

188.    Izrayev and John Doe Defendants 1-10 are owners of, employed by, or associated with the Town Supply enterprise.

189.    Izrayev and John Doe Defendants 1-10 knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Town Supply's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Town Supply was not eligible to receive under the New York No-Fault Laws because: (i) Town Supply submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (ii) Town Supply submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity – that are designed solely to financially enrich the Defendants and others presently not known; and (iii) to the extent that Town Supply actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the permissible reimbursement amount for the Fraudulent Equipment.  A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified

49

through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

190.   Izrayev and John Doe Defendants 1-10 knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

191.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $460,000.00 pursuant to the fraudulent bills submitted through Town Supply.

192.   By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Town Supply and Izrayev**
**(Common Law Fraud)**

193.   GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 172 of this Complaint as if fully set forth at length herein.

194.   Town Supply and Izrayev intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for Fraudulent Equipment.

195.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements and not based upon medical necessity, which were used to financially enrich those that participated in the scheme; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME  and/or

OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; and (iii) in every claim, to the extent that any Fraudulent Equipment was actually provided, the charges for Fraudulent Equipment contained in the bills to GEICO misrepresented the permissible reimbursement amount.

196.    Town Supply and Izrayev intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Town Supply that were not compensable under the No-Fault Laws.

197.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $460,000.00 pursuant to the fraudulent bills submitted by the Defendants through Town Supply.

198.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

199.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Town Supply and Izrayev**
**(Unjust Enrichment)**

200.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 172 of this Complaint as if fully set forth at length herein.

201.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

202.     When GEICO paid the bills and charges submitted by or on behalf of Town Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

203.     The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

204.     The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

205.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $460,000.00.

## JURY DEMAND

206.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against Town Supply, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Town Supply has no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of action against Izrayev, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $460,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Izrayev and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of

$460,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

       D.     On the Fourth Cause of Action against Town Supply and Izrayev, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $460,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

       E.     On the Fifth Cause of Action against Town Supply and Izrayev, more than $460,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
       April 25, 2022

                       RIVKIN RADLER LLP

                       By: _/s/ Barry Levy_____
                            Barry I. Levy, Esq.
                            Michael A. Sirignano, Esq.
                            Jennifer Abreu, Esq.
                       926 RXR Plaza
                       Uniondale, New York 11556
                       (516) 357-3000

                       *Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*